IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2016 MAR 14  P 1: 20

CLERK'S OFFICE
AT GREENBELT

BY_____DEPUTY

DONALD MAZIARZ,

    Plaintiff,

v.

CORIZON, INC., *et al.*,

    Defendants.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Case No.: GJH-14-3615

## MEMORANDUM OPINION

Currently pending before the Court is a Motion to Dismiss filed on behalf of defendants

Dr. Andrew Moultrie, Dr. Syed Rizvi, John Moss, Lashauna Grier, Emanuel Esianor, and

Wexford Health Sources, Inc. (the "Wexford defendants"). ECF No. 29.[1] Plaintiff Donald

Maziarz has responded, ECF No. 35, and the Wexford defendants have replied. ECF No. 38. Also

pending is a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment filed on

behalf of defendants Corizon, Inc., John Moss, Andrew Moultrie, Damon Fayell, Julianne Jenny,[2]

Michael Roman, and Eric Booker[3] (the "Corizon defendants"). ECF No. 42. Maziarz has

responded. ECF No. 52. Correctional Defendant John Wolfe has also filed a Motion to Dismiss,

or in the Alternative, Motion for Summary Judgment, ECF No. 46, to which Maziarz has not

---

[1] Some of the individual defendants have dual representation in this matter, as on June 30, 2012, Corizon, Inc.'s contract as health care provider to Division of Correction ("DOC") inmates ended, and on July 31, 2012, Wexford Health Sources, Inc.'s contract began providing services to DOC inmates as the health care contractor.

[2] The Clerk shall amend the docket to reflect the correct name of defendant.

[3] The Clerk shall amend the docket to reflect the correct name of defendant.

responded.[4]

Upon review of papers and exhibits filed, the court finds an oral hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2014). For the reasons stated below, the dispositive motions filed by the Corizon defendants and Warden Wolfe will be granted and the dispositive motion filed by the Wexford defendants shall be granted in part and denied in part for reasons stated herein.

## I.    BACKGROUND

### A.    Maziarz's Contentions

On November 17, 2014, Plaintiff, who is incarcerated at the Jessup Correctional Institution ("JCI"), filed a self-represented civil rights complaint against Corizon, Inc. and Wexford Health Sources, Inc., alleging that beginning in 2010 he has been denied constitutionally adequate medical care for his cervical spine injury. ECF No. 1 at 4. He claims that he was not provided visits or ordered MRIs because JCI Medical Department and its supervisors failed to work together to coordinate his medical care. He states that he received only partial medical treatment and has been left disabled due to lack of follow up. *Id.*

On January 7, 2015, Maziarz filed a court-directed Amended Complaint, naming JCI Warden John Wolfe,[5] Corizon, Inc., Wexford Health Sources, Inc., Damon Fayell, M.D., Andrew Moultrie, M.D., Syed Rizvi, M.D., Ms. Jenny, Lashauna Grier, Michael Romain, P.A., John

---

[4]Pursuant to the dictates of *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975), on August 10, 2015, Maziarz was notified that Wolfe had filed a dispositive motion, the granting of which could result in the dismissal of his action. ECF No. 47. He was also informed that he was entitled to file materials in opposition to that motion within seventeen (17) days from the date of that letter and that his failure to file a timely or responsive pleading or to illustrate, by affidavit or the like, a genuine dispute of material fact, could result in the dismissal of his case or in the entry of summary judgment without further notice of the court. *Id.* Plaintiff sought and was granted extensions of time to and including February 15, 2016, to file any opposition. ECF No. 60, 62 & 64.

[5] Plaintiff indicates that Warden Wolfe is directly responsible for the care and welfare of inmates housed at JCI. *Id.* at 5.

Moss, P.A., Radiologist Eric, and Emanuel Esianor, P.A., as defendants, alleging he has been denied constitutionally adequate medical care. ECF No. 5.

Maziarz indicates that in in January of 2010, he was evaluated due to complaints of ongoing muscle contractions in his neck, leg, arms and hands. ECF No. 5 at 8. He further indicates that from 2010–2012 he was evaluated by various prison medical providers and outside specialists, culminating in surgery performed on February 29, 2012. *Id.* at 9.

On March 5, 2012, Maziarz was discharged from the prison infirmary back to a cell. Despite orders that he not be housed in a double bunk cell, because of stiches and metal plates in his neck, he was placed in a double bunk cell and forced to sleep on the floor. *Id.* at 10. He states that he notified correctional staff that he could not be housed in a double bunk cell but they told him that in order for his cell assignment to be altered "medical ha[d] to do it." *Id.* After complaining for six days, the supervisor removed Maziarz's cell buddy, but correctional staff could not do anything else "because they wouldn't give [him] the proper papers work [sic] so [he could] be relocated into a single bunk cell." *Id.*

After his surgery, Maziarz continued to have difficulty obtaining the necessary paper work to obtain a single cell. He also details difficulty in being scheduled for an MRI, and accessing a physician rather than a physician's assistant for follow-up care. *Id.* at 1–12. Maziarz indicates that since September 19, 2012, he has requested an order for single cell status but nothing has been done. *Id.* He indicates that in September 2012 the surgeon directed he return in a month for follow up, but he was never returned to the University Hospital Medical Center Neurosurgeon Clinic.[6] *Id.* at 13. Throughout his Amended Complaint, Maziarz details his efforts to secure single cell

---

[6] Maziarz indicates, however, that he was returned to the University of Maryland Medical Center on December 19, 2012 for a CT/MRI with contrast. *Id.* at 13. He also indicates that on January 18, 2013, he was sent to Bon Secours Hospital for a CT scan but at that time he was to receive an MRI. He contends that "they sent the wrong paperwork." *Id.* at 14.

status, a follow-up visit with the University neurosurgeon, and treatment for other ancillary cervical spine problems. ECF No. 5. He seeks compensatory and punitive damages as well as injunctive relief directing that he receive permanent single bunk housing, physical therapy, and proper care. *Id*. at 19.[7]

### B.    Corizon's Contentions

Corizon, Inc., provided health care services to Maryland inmates from January 2010 until June 30, 2012, when its contract with the State of Maryland was terminated.[8] ECF No. 42. Records provided by Corizon note that Maziarz suffers from hypertension, chronic low back pain, as well as degenerative disc disease of the cervical spine. ECF No. 42-1.

In early 2010, Maziarz received treatment for cervical spine pain. An x-ray taken on January 13, 2010, revealed reduced disc space and degenerative changes at C6-7. *Id*. at 5. A neurology consultation was requested to evaluate Maziarz's symptoms of paresthesia. *Id*. at 6. Wexford, the utilization management contractor, approved the off-site consultation on February 3, 2010. *Id*. at 10.

Maziarz was examined at Bon Secours Neurology on March 4, 2010. *Id*. at 8–9. He was diagnosed as suffering from likely cervical radiculopathy at C5-6. It was recommend that he undergo an MRI of his cervical spine and, depending on the results, the need for  physical therapy or surgery would be further be explored. *Id*. at 9. The MRI, requested on March 5, 2010 and conducted on April 5, 2010, showed degenerative disk disease and spondylosis at C6-7, resulting in mild compression of the spinal cord and minimal cord signal consistent with edema or

---

[7] Maziarz has provided affidavits from other inmates averring that in April, May, and August, of 2012, they witnessed him in pain. When it was suggested he go to medical, Maziarz responded that he did but had to wait "until they send me back." ECF 18-1. When it was suggested he speak to the lieutenant, Maziarz responded that it was a medical issue. ECF 18-2. On one occasion fellow inmate Danny Horton assisted Maziarz back to his housing unit. ECF 18-3.

[8] While Corizon was the health care contractor, Wexford served as the utilization review manager. *Id*., Ex. 1 at 10. At the termination of Corizon's contract on June 30, 2012, Wexford became both the utilization review manager as well as the health care contractor for the Maryland Division of Corrections.

myelomalacia and right greater than left neural foraminal stenosis at several upper cervical levels due to bony overgrowth most prominent at C4-5. *Id*. at 16–18, 20–21, 25.

Maziarz was evaluated by a neurosurgeon on May 19, 2010, who found no weakness or myelopathy or discrete dermatomal symptoms. The surgeon requested that Maziarz bring his MRI so he could be definitively evaluated. The surgeon also recommended anti-inflammatories and physical therapy. The surgeon found no need for urgent surgical intervention and recommended "no double bed if possible." *Id*. at 31–33.

Maziarz's condition was monitored and he was provided pain medication. *Id*. at 38–39, 43, 57, 71. He was provided additional cervical x-rays on June 17, 2010 and December 8, 2010. The x-rays showed moderate disc height reduction at C6-7, and no acute fracture dislocation or subluxation. *Id*. at 45, 64. Another cervical spine MRI was approved on December 30, 2010. *Id*. at 66.

In 2011, Maziarz was approved for surgery for the degenerative condition of his cervical spine. Pre-operative laboratory work was begun in June of 2011. *Id*. at 79–80. A note was entered on July 20, 2011, that the neurosurgeon had not received the lab work and that another MRI was needed before the surgery. *Id*. at 82. It was also noted that the MRI was authorized and the laboratory work would be done within two weeks of Maziarz's scheduled August 17, 2011 appointment. *Id*. He was seen by the neurosurgeon on December 21, 2011, and surgery was recommended. *Id*. at 91.

On February 28, 2012, Maziarz underwent an anterior cervical disk fusion at C6-7. ECF No. 1 at 6. He was discharged from the hospital to the prison infirmary on March 2, 2012. ECF No. 42-1 at 103–104. Maziarz's discharge instructions indicated he should wear a cervical collar for four weeks. It was noted that he was walking without difficulty in the infirmary and in stable

5

condition. *Id.* at 103–08. He was discharged from the infirmary to JCI on March 5, 2012, with instructions to continue wearing his cervical collar for three to four weeks and to follow up with neurosurgery in six to eight weeks. *Id.* at 109–10.

On May 17, 2012, Dr. Moultrie noted that Maziarz was seen for neurosurgery follow up. Moultrie discussed Maziarz's case with neurosurgery due to Maziarz's complaints of left side arm and neck pain, along with pain and tingling radiating into the left arm and occasionally into the fingers. Maziarz also reported occasional short pain in his left foot. The neurosurgeon found no weakness on exam and the pain was not dermatomal. Maziarz sought orders for a permanent single cell and heating pad from the neurosurgeon. Dr. Moultrie indicated he would inquire as to whether a pillow could be provided and extended Maziarz's order for a single cell for one month. Moultrie indicated he would see what the MRI and follow up with the neurosurgeon indicated as to the stability of Maziarz's neck. *Id.* at 119.

Approximately eight weeks after Maziarz's surgery, an undated, unsigned, progress note indicates that Maziarz continued to wear his cervical collar and refused to remove it. *Id.* at 34–35. Maziarz sought renewal of the order that he be single celled and requested feed-in status. The Medical Director discussed Maziarz's care with him and attempted to educate him regarding the danger of wearing the cervical collar too long, e.g. an increased in stiffness and increased muscle weakness of the supporting muscles of the neck. *Id.* Maziarz refused to take off the collar. His paperwork for use of the collar, feed-in status, and single cell status were not renewed. It was confirmed that Maziarz was scheduled for follow up with the neurosurgeon on May 16, 2012. *Id.* at 35.

An MRI of Maziarz's cervical spine was taken on June 14, 2012, revealing post anterior cervical discectomy and fusion at C6-7. Minimal disc bulging at C4-5 level was noted, "touching

but not displacing or compressing the spinal cord." *Id.* at 124–25. At C6-7 the "central canal is grossly patient. [sic] Bilateral neural foraminal stenosis [was] suspected." *Id.* at 123. Additionally, it was noted that "[l]eft foraminal stenosis at C7-T1, not seen previously seen . . . could be artifact resulting from differences in the exact level scan. Correlation with CT is suggested to assess bony detail." *Id.*

Wexford assumed the primary medical services contract for the State of Maryland on July 1, 2012. As such, Corizon provided no further treatment to Maziarz. ECF No. 42 at 9.

### C.    Wexford's Contentions

The Wexford defendants have provided no further medical records for Maziarz, maintaining that Maziarz's complaint should be dismissed, *inter alia*, for failure to state a claim. They indicate that Maziarz's Amended Complaint itself reveals that he had numerous visits, evaluations, and treatments by a number of healthcare providers over a five year period thus belying his claim that he was denied medical care. ECF No. 29-1 at 3. Wexford defendants also maintain that Maziarz has not asserted any claims against Dr. Rizvi, John Moss, Lashauna Grier, or Emmanuel Esianor and his complaint must be dismissed as to these defendants. *Id.* Defendants summarize Maziarz's allegations as to Dr. Moultrie as based on Dr. Moultrie's failure to personally examine him on certain occasions while physicians assistants did; Dr. Moultrie's failure to increase his blood pressure medicine; Dr. Moultrie's failure to remove Maziarz's neck brace; and Dr. Moultrie's refusal to order Maziarz be placed in single bunk housing. *Id.* at 3–4.

### D.    Warden Wolfe's Contentions

Warden Wolfe avers that he does not supervise medical personnel. ECF No. 46-2, ¶ 3. He states that his responsibilities are to act as the chief administrator of JCI, overseeing the administration of personnel and programs in order to ensure the safe, efficient and lawful function

of JCI. *Id.* Within the Maryland DOC, medical care for inmates is provided by private health care contractors. *Id.*, ¶ 4. Wolfe avers that it is beyond the scope of his duties to perform any kind of medical treatment or to prescribe or deny a particular course of treatment. Additionally, he states he has no authority to dictate the type of medical treatment an inmate is to receive or to influence the medical decisions of the health care contractors. *Id.* Wolfe avers that he has not been involved in, interfered with, or delayed the provision of medical care to Maziarz. *Id.* ¶ 5. Wolfe further avers that he is unaware of any staff under his authority interfering or delaying the provision of medical care to Maziarz. *Id.*, ¶ 6.

## II.    STANDARD OF REVIEW

### A.    Motion to Dismiss

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325–26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)). A "plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted). Nonetheless, the complaint does not need "detailed factual allegations" to survive a motion to dismiss. *Id.* A complaint need only state "enough facts to state a claim to relief that is plausible on its face." *Id.* 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*

*v. Iqbal*, 556 U.S.662, 678 (2009). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed.R.Civ.P. 8(a)(2)).

In reviewing the complaint in light of a motion to dismiss pursuant to Rule 12(b)(6) the court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *See Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). The court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

## B.    Motion for Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "This standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original). Thus, "[t]he party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore*

*Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

On a motion for summary judgment, the court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks and citations omitted).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

## III.   ANALYSIS

### A.   Statute of Limitations

Corizon defendants allege that some of Maziarz's claims are barred by the statute of limitations. Section 1983 provides a federal cause of action, but with respect to the statute of limitations, the Court must look to the law of the State in which the cause of action arose, specifically, the relevant state statute of limitations for personal-injury torts. *Wallace v. Kato,* 549 U.S. 384, 387 (2007) (citing *Owens v. Okure,* 488 U.S. 235, 249-250, (1989); *Wilson v. Garcia,* 471 U.S. 261, 279-280 (1985)). In Maryland, the applicable statute of limitations is three years from the date of the occurrence. *See* Md. Cts & Jud. Proc. Code Ann. § 5-101.

Although the state statute of limitations applies, the time of accrual of the action is a federal question. *Cox v. Stanton,* 529 F.2d 47, 50 (4th Cir. 1975). The running of the statute of limitations begins when plaintiff knows or has reason to know of his injury. *Id.* Here, Maziarz alleges he was denied constitutionally adequate medical care beginning in 2010. ECF Nos. 1 & 5. Because Maziarz's initial complaint was not filed until November 12, 2014,[9] ECF No. 1, the statute of limitations bars consideration of his claim as it relates to the provision of medical care occurring on or before November 12, 2011.

### B.   Qualified Immunity

The Wexford defendants, citing *Filarsky v. Delia*, 132 S.Ct. 1657, 1667–68 (2012), claim that they are entitled to qualified immunity. ECF No. 29 at 8. *Filarsky* overturned the denial of qualified immunity to an attorney who was retained by a city in California to assist in an internal investigation concerning a firefighter's potential wrongdoing. *Id.* at 1666. The Wexford

---

[9] A self-represented inmate is entitled to the benefit of the prison mailbox rule, under which the court regards a petition or motion as having been filed when delivered to prison authorities for mailing to the court. *See Houston v. Lack*, 487 U.S. 266, 276 (1988) (finding pro se prisoner's notice of appeal was filed at moment of delivery to prison authorities for mailing to district court).

defendants fail to demonstrate that *Filarsky* has been extended to contractual health care providers working in detention centers or correctional facilities, and the Court will not do so here.

### C.   Respondeat Superior

The law in the Fourth Circuit is well established that the doctrine of *respondeat superior* does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004). A private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of *respondeat superior*. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982).

Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F. 3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994).

Maziarz's claims against Warden Wolfe, Wexford Health Sources, Inc., and Corizon, Inc., which detail no personal involvement, are insufficient. Maziarz has pointed to no action or

inaction on the part of Warden Wolfe, Wexford Health Sources, Inc., and Corizon, Inc. that resulted in a constitutional injury, and accordingly, his claims against these defendants shall be dismissed.[10] This determination, however, does not end the Court's inquiry.

### D.    Medical Claim

#### i.    Corizon Defendants

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991)). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants—or their failure to act—amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The medical condition at issue must be objectively serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care).

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."

---

[10] In light of this conclusion, the Court need not consider Wolfe's claim that Maziarz failed to exhaust administrative remedies.

*Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) (quoting *Farmer* 511 U.S. at 844.) If the requisite subjective knowledge is established, officials may avoid liability "if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew existed at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones* 145 F. 3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id.* at 169.

In essence, the treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted). "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." *Miltier*, 896 F.2d at 851. Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer v. Brennan*, 511 U. S. 825, 837 (1994). Thus, a health care provider must have actual knowledge of a serious condition, not just knowledge of the symptoms. *Quinones*, 145 F.3d at 168. Mere negligence or malpractice does not

rise to a deprivation of constitutional rights. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975);

*Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986).

Additionally, the right to treatment is "limited to that which may be provided upon a

reasonable cost and time basis and the essential test is one of medical *necessity* and not simply

that which may be considered merely *desirable.*" *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th

Cir. 1977). Here, the record evidence indicates that during the relevant time where Corizon

employees provided medical care to Maziarz (November 12, 2011 through June 30, 2012),

Corizon and its employees considered Maziarz's requests for medical care and his needs were

addressed. Maziarz's medical records demonstrate that he was seen regularly by medical

personnel and referred for off-site medical testing, which ultimately resulted in his undergoing

surgery. In the approximate two months that Corizon employees were responsible for Maziarz's

medical care after his surgery, he was seen for follow up care and additional diagnostic testing

was provided.

Any delays in providing treatment, diagnostic evaluations, or follow up care which have

occurred do not appear to be deliberate, nor have they resulted in any harm to Maziarz. Maziarz's

numerous grievances with the medical decisions made regarding what tests and treatments are

necessary in light of the symptoms presented are reflective of his frustration, but "[d]isagreements

between an inmate and a physician over the inmate's proper medical care do not state a § 1983

claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th

Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)). There are no exceptional

circumstances alleged in this case. Defendants John Moss, Andrew Moultrie,[11] Damon Fayall,

---

[11] John Moss and Andrew Moultrie are entitled to summary judgment as to Maziarz's claims arising on or before June 30, 2012. Maziarz's claims as to Moss and Moultrie occurring after June 30, 2012, when they were employed by Wexford, shall proceed.

Julianne Jenny, Michael Roman and Eric Booker are therefore entitled to summary judgment for their actions during the time they were employed by Corizon.

### ii.    Wexford Defendants

Wexford maintains that Maziarz has not asserted any claims against Dr. Syed Rizvi, John Moss, Lashauna Grier, or Emmanuel Esianor for the time during which its employees provided care for Maziarz. The Court disagrees. In his Amended Complaint, Maziarz states that Rizvi was one of the doctors obligated to provide medical care and insure that his medical directives were fulfilled, which he alleges did not occur. ECF No. 5 at 5. He also alleges that Grier was vested with the authority to coordinate inmates' medical care and concerns with security staff. *Id.* at 6. John Moss, a physician's assistant, was responsible, according to Maziarz, for preparing written diagnosis and making the proper referral to the supervising physician, among other things. *Id.* at 7. Additionally, he claims that Moss failed to properly investigate the status of his care. *Id.* at 9. Maziarz claims that "Emanuel Esianor . . . a Physician's Assistant who by his action and inaction failed to properly treat Plaintiff, advance detailed and accurate information for additional treatment of Plaintiff but to do so as required." *Id.* at 7.

Defendants summarize Maziarz's allegations as to Dr. Moultrie as follows: Moultrie did not personally examine him on certain occasions while physicians assistants did; Moultrie should have increased his blood pressure medicine; Moultrie should have ordered the removal of Maziarz's neck brace; and Moultrie should have ordered "single bunk" housing ECF No. 29-1 at 2. The Court does not construe Maziarz's allegations so narrowly. A fair reading of Maziarz's Complaint indicates that, in addition to claiming that Moultrie refused to order that Maziarz be single-celled and failed to provide appropriate post-surgical care and follow up, Maziarz alleges that Moultrie delayed evaluating him, and intentionally interfered with or delayed Maziarz's

follow up care with off-site medical providers. ECF No. 5 at 11, 13–15. Maziarz complains that he has been denied meaningful post-surgical follow up care as well as appropriate care for his continuing degenerative disk disease. ECF Nos. 1 & 5. In light of Maziarz's diagnosed degenerative disc disease and the alleged delay, interference, and withholding of medical services, the court finds that he has sufficiently stated a claim. Wexford defendant's motion to dismiss shall be denied as to defendants Dr. Rizvi, John Moss, Lashauna Grier, Emmanuel Esianor, and Dr. Moultrie.

## IV.   CONCLUSION

For the reasons stated, the dispositive motions filed by the Corizon defendants and Warden Wolfe are granted. The dispositive motion filed by the Wexford defendants is granted as to Wexford Health Sources, Inc., and denied as to defendants Dr. Rizvi, John Moss, Lashauna Grier, Emmanuel Esianor, and Dr. Moultrie. A separate Order follows.


Date: 3/14/2016

George J. Hazel
United States District Judge

17